Terence G. Hanlon and Gertrude B. Hanlon (Husband and Wife) v. Commissioner.
Hanlon v. Commissioner
Docket No. 63579.
United States Tax Court
T.C. Memo 1960-180; 1960 Tax Ct. Memo LEXIS 116; 19 T.C.M. (CCH) 954; T.C.M. (RIA) 60180; August 31, 1960
Maurice Austin, Esq., 350 Fifth Avenue, New York, N. Y., and Alice Soled, Esq., for the petitioners. Charles M. Greenspan, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in income taxes and additions to such taxes against petitioners for the years 1943, 1944, and 1946 through 1953 as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
291(a)
293(b)
294(d)(2)
294(d)(1)(A)
1943
$4,174.78
$ 663.13
$ 2,087.39
1944
7,634.41
1,073.98
3,817.21
1946
823.11
205.78
1,494.09
$ 93.54
$ 155.90
1947
667.85
166.96
8,761.66
636.57
1,060.95
1948
152.92
38.23
9,396.44
610.23
1,017.05
1949
54.03
13.51
8,560.05
640.42
1,067.37
1950
1,948.52
487.13
9,791.99
736.81
1,228.02
1951
1,242.86
310.71
10,348.65
738.10
1,230.17
1952
1,189.32
297.33
12,014.06
924.87
1,541.45
1953
491.56
73.73
8,999.34
919.96
563.10
*117 At the trial herein respondent conceded that petitioner Gertrude B. Hanlon is not liable for any deficiencies or additions to tax for the years 1943 and 1944. Subsequently respondent conceded error with regard to his determination that additions to tax should be imposed under the provisions of section 294(d)(2) for the years 1946 through 1953. Petitioners concede that they are liable for the deficiencies in income taxes in the amounts determined by respondent for the years 1946 through 1953. Petitioner Terence G. Hanlon concedes the correctness of the amounts of the taxes determined to be due for the years 1943 and 1944, but contends that he filed returns for those years and therefore liability for the payment of such taxes is barred by the statute of limitations. Petitioners concede liability for the additions to taxes under section 294(d)(1)(A) except as to petitioner Gertrude for the years 1946 through 1949. Findings of Fact Some of the facts have been stipulated by the parties. We find those facts to be as stipulated and incorporate herein by this reference the stipulation and the exhibits attached thereto. The petitioners are husband and wife having been married *118 on November 6, 1921. From 1935 to December 1949 they lived in their own home at 88 Lancaster Avenue, Bufflao, New York. From December 1949 to date they have resided in an apartment building at 800 West Ferry Street, Buffalo, New York. Terence G. Hanlon is sometimes hereinafter referred to as "petitioner." The petitioner was born in Rochester, New York, on April 26, 1892. His education included 3 years of high school and 2 years at the Mechanics Institute, Rochester, New York. After leaving the Mechanics Institute in 1909, petitioner worked as apprentice to an architect for about a year and a half, then worked as an apprentice plumber for about 3 years, and was in the real estate business with an experienced real estate man for a year and a half. Toward the end of 1914 petitioner went to work for his father in a small business which the latter carried on in the buying and selling of scrap metals. Petitioner worked in that business as an employee until sometime in 1921, with interruption for active overseas military service in World War I from his enlistment in July or August of 1917 until March 1919. Petitioner had nothing to do with the keeping of books or with any tax returns *119 of the business. Thereafter, petitioner was employed to buy and sell scrap metal by Pennsylvania Wood and Iron Company, which was engaged in the wholesale scrap metal business on a scale much larger than his father. He worked on a commission basis of 50 per cent of the net profit on the sale of scrap metal purchased by him. He stayed with this firm until the fall of 1928, during which time his annual earnings ranged from $5,000 to $7,000. In 1928 petitioner and a young man with whom he joined were employed to open up an office as comanagers for Hausemann and Wimmer Company, a larger company in the scrap metal business. Their duties as comanagers were to buy and sell scrap metal, and, as compensation, petitioner and his associate jointly received 50 per cent of the net profits of the Buffalo office. Petitioner continued in this employment until the middle of 1930, during which time he made $12,000 to $14,000 per annum. From 1930 to 1933 petitioner was not employed and tried to earn income by freelance work but with practically no success. In 1933 petitioner was employed to work in the Buffalo office of Summer & Company, engaged in the purchase and sale of scrap metal, as an employee *120 under Max Pressler, the manager of that office. Petitioner eventually became a comanager of the Buffalo office with Pressler, and from about 1940 on petitioner shared equally with Pressler in 50 per cent of the net profits of the Buffalo office, determined after subtracting a basic charge made by the company's main office in Columbus, Ohio. Petitioner was also paid as compensation $400 per month for part of the time and $500 per month during the latter part of his employment. Because the net profits of the office for each year could not be determined until after the end of the year, the compensation based on such profits was paid in the following year. Petitioner's employment with Summer & Company continued until the end of 1946. Petitioner received compensation income from Summer & Company in the following amounts during each of the years 1941 through 1945: 1941
$20,734.44
1942
11,996.13
1943
13,376.69
1944
17,940.33
1945
16,386.66
Petitioner filed income tax returns when his receipt of income required such filing consistently from shortly after World War I until 1944. Petitioner filed timely income tax returns for the years 1941, 1942, and 1945 showing *121 tax liability, taxes withheld by employer, and net tax payable, which petitioner paid, as follows: Income
Tax Lia-
Taxes
Net Tax
Year
bility
Withheld
Payable
1941
$2,651.86
$2,651.86
1942
1,691.80
1,691.80 [1]
1945
6,384.53
$3,327.10
3,057.43
On or about September 15, 1943, petitioner filed a declaration of estimated income tax for the year 1943 and in September and December of 1943 made two payments of $272.41 each on account of such estimated tax declaration. Under date of June 28, 1944, respondent issued to petitioner a notice of deficiency in income tax for the year 1941 in the amount of $681.61, arising from respondent's determination that certain deductions claimed as expenses in the amount of $1,482 were not allowable and that dividends in the amount of $575 had been omitted. On September 26, 1944, petitioner filed a petition in the Tax Court with respect to said notice of deficiency. A decision was entered in said Tax Court proceeding *122 on December 11, 1944, pursuant to stipulation filed December 6, 1944, deciding that there was a deficiency in the amount of $156.76. During the time that petitioner was employed by Summer & Company he followed a regular practice in the preparation of his income tax returns. Shortly before the returns were due each year he and Max Pressler would remind each other that their returns had to be prepared, and just before March 15 they would spend an evening at the office, prepare their returns together, and put them in the mail. Petitioner's returns were handwritten by him, except as to attached schedules which were typed. In preparing his returns petitioner used workpapers or slips of paper to assemble the data as to his investment income and deductions. Petitioners did not file timely income tax returns for the years 1943 and 1944 or for the years 1946 through 1953. On May 25, 1954, the petitioners filed joint income tax returns for the years 1946 through 1953 with the director of internal revenue for the district of Buffalo, New York. These returns showed the following amounts of income tax, income tax withheld under subchapter D of chapter 9 of the Internal Revenue Code of 1939, *123 and net income tax liability: Income
Net Income
Income
Tax
Tax Lia-
Year
Tax
Withheld
bility
1946
$ 2,165.07
$1,429.20
$ 735.87
1947
16,855.47
6,913.82
9,941.65
1948
18,639.96
8,622.40
10,017.56
1949
17,066.06
6,446.40
10,619.66
1950
17,635.45
7,303.80
10,331.65
1951
19,454.44 [1]
8,395.60
11,058.84
1952
22,838.80
8,613.60
14,225.20
1953
17,507.12
8,613.60
8,893.52
The amount of income tax withheld for each year was in fact withheld prior to the due date of th income tax return of petitioners for said year. The amounts of net income tax liability shown by these returns were paid by petitioners on May 25, 1954. Computed on the basis of the amounts of tax shown in the returns, respondent assessed the following amounts of interest and additions to tax under section 291(a), which interest and additions to tax were paid by petitioners by several payments from July 21, 1954, to August 31, 1954: *124 Section 291(a)
Calendar
Additions
Year
Interest
to Tax
1946
$ 317.63
$ 183.97
1947
3,694.71
2,485.41
1948
3,121.87
2,504.39
1949
2,672.33
2,654.92
1950
1,979.96
2,582.91
1951
1,455.79
2,764.71
1952
1,019.09
3,556.30
1953
103.52
1,334.03
$14,364.90
$18,066.64 The additions to tax were assessed without the prior issuance of a notice of deficiency. Petitioners did not file a declaration of estimated tax for any of the years 1946 through 1953. The respondent redetermined the amounts of gross income, deductions, and resulting income tax liabilities shown in the returns, and the amounts thus redetermined are conceded to be correct. The amounts of gross income, deductions, and resulting income tax liabilities as shown in the returns and as redetermined by respondent, and the differences between th two sets of figures are set forth in the following tabulation: Per Return
Increases or
Revised Amounts
Filed by
(Decreases) by
as Determined
Petitioners
Respondent
by Respondent
(a) Calendar year 1946: Items of Gross Income: Salaries
$ 9,318.84
$ 9,318.84
Dividends
1,268.00
$ 125.00
1,393.00
Interest
43.12
43.12
Net capital gain or (loss)
984.13
2,319.64
3,303.77
Total gross income
$11,570.97
$2,487.76
$14,058.73
Items of Deduction: Contributions
$ 222.00
$ 222.00
Interest
112.50
112.50
Taxes
634.15
$ 95.92
730.07
Miscellaneous
664.02
664.02
Total deductions
$ 1,632.67
$ 95.92
$ 1,728.59
Net income
$ 9,938.30
$2,391.84
$12,330.14
Income tax liability before
credit
for income taxes withheld
$ 2,165.07
$ 823.11
$ 2,988.18
Income taxes withheld
1,429.20
1,429.20
Income tax liability after
credit for
income taxes withheld
$ 735.87
$ 823.11
$ 1,558.98
(b) Calendar year 1947: Items of Gross Income: Salaries
$39,088.03
$39,088.03
Dividends
1,322.40
$ 100.00
1,422.40
Interest
35.00
28.74
63.74
Net capital gain or (loss)
(866.96)
945.16
78.20
Total gross income
$39,578.47
$1,073.90
$40,652.37
Items of Deduction: Contributions
$ 314.k0
$ 314.50
Interest
225.00
225.00
Taxes
619.46
619.46
Miscellaneous
369.35
369.35
Total deductions
$ 1,528.31
$ 1,528.31
Net income
$38,050.16
$1,073.90
$39,124.06
Income tax liability before
$16,855.47
$ 667.85
$17,523.32
credit for income taxes
withheld
Income taxes withheld
6,913.82
6,913.82
Income tax liability after
credit for
income taxes withheld
$ 9,941.65
$ 667.85
$10,609.50
(c) Calendar year 1948: Items of Gross Income: Salaries
$52,400.00
$52,400.00
Dividends
1,997.00
$ 181.00
2,178.00
Interest
77.37
113.52
190.89
Total gross income
$54,474.37
$ 294.52
$54,768.89
Items of Deduction: Contributions
$ 285.00
$ 285.00
Interest
225.00
225.00
Taxes
478.46
478.46
Miscellaneous
714.32
714.32
Total deductions
$ 1,702.78
$ 1,702.78
Net income
$52,771.59
$ 294.52
$53,066.11
Income tax liability before
$18,639.96
$ 152.92
$18,792.88
credit for income taxes
withheld
Income taxes withheld
8,622.40
8,622.40
Income tax liability after
credit for
income taxes withheld
$10,017.56
$ 152.92
$10,170.48
(d) Calendar year 1949: Items of Gross Income: Salaries
$48,228.53
$48,228.53
Dividends
2,886.50
2,886.50
Interest
140.82
$ 111.53
252.35
Net capital gain
201.90
201.90
Total gross income
$51,457.75
$ 111.53
$51,569.28
Items of Deduction: Contributions
$ 220.00
$ 220.00
Interest
225.00
225.00
Taxes
559.89
559.89
Miscellaneous
712.69
712.69
Total deductions
$ 1,717.58
$ 1,717.58
Net income
$49,740.17
$ 111.53
$49,851.70
Income tax liability before
credit
for income taxes withheld
$17,066.06
$ 54.03
$17,120.09
Income taxes withheld
6,446.40
6,446.40
Income tax liability after
$10,619.66
$ 54.03
$10,673.69
credit for income taxes
withheld
(e) Calendar year 1950: Items of Gross Income: Salaries
$44,400.00
$44,400.00
Dividends
5,206.83
$ 391.25
5,598.08
Interest
229.75
13.31
243.06
Net capital gain
4,144.38
44.00
4,188.38
Total gross income
$53,980.96
$ 448.56
$54,429.52
Items of Deduction: Optional standard deduction
$ 1,000.00
$ 1,000.00
Net income
$52,980.96
$ 448.56
$53,429.52
Income tax liability before
$17,635.45
$1,948.52
$19,583.97
credit for income taxes
withheld
Income taxes withheld
7,303.80
7,303.80
Income tax liability after
credit for
income taxes withheld
$10,331.65
$1,948.52
$12,280.17
(f) Calendar year 1951: Items of Gross Income: Salaries
$44,400.00
$44,400.00
Dividends
5,371.39
$1,233.56
6,604.95
Interest
232.83
60.14
292.97
Net capital gain
1,133.08
1,133.08
Total gross income
$50,004.22
$2,426.78
$52,431.00
Items of Deduction: Optional standard deduction
$ 1,000.00
$ 1,000.00
Net income
$49,004.22
$2,426.78
$51,431.00
Income tax liability before
$19,454.44 [2]
$1,242.86
$20,697.30
credit for income taxes
withheld
Income taxes withheld
8,395.60
8,395.60
Income tax liability after
credit for
income taxes withheld
$11,058.84
$1,242.86
$12,301.70
(g) Calendar year 1952: Items of Gross Income: Salaries
$44,400.00
$44,400.00
Dividends
4,545.44
$1,806.02
6,351.46
Interest
2,281.44
(4.01)
2,277.43
Net capital gain
2,365.72
2,365.72
Total gross income
$53,592.60
$1,802.01
$55,394.61
Items of Deduction: Contributions
$ 483.00
$ 483.00
Miscellaneous
1,199.82
1,199.82
Total deductions
$ 1,682.82
$ 1,682.82
Net income
$51,909.78
$1,802.01
$53,711.79
Income tax liability before
$22,838.80
$1,189.32
$24,028.12
credit for income taxes
withheld
Income taxes withheld
8,613.60
8,613.60
Income tax liability after
credit for
income taxes withheld
$14,225.20
$1,189.32
$15,414.52
(h) Calendar year 1953: Items of Gross Income: Salaries
$44,400.00
$44,400.00
Dividends
5,455.26
$ 790.08
6,245.34
Interest
665.86
2.74
668.60
Net capital (loss)
(1,000.00)
(1,000.00)
Total gross income
$49,521.12
$ 792.82
$50,313.94
Items of Deduction: Contributions
$ 285.00
$ 285.00
Miscellaneous
5,979.46
5,979.46
Total deductions
$ 6,264.46
$ 6,264.46
Net income
$43,256.66
$ 792.82
$44,049.48
Income tax liability before
$17,507.12
$ 491.56
$17,998.68
credit for income taxes
withheld
Income taxes withheld
8,613.60
8,613.60
Income tax liability after
credit for
income taxes withheld
$ 8,893.52
$ 491.56
$ 9,385.08
*125 The amounts of gross income from "salaries" shown above consisted of compensation income from petitioner's employers during those years, Summer & Company and Luria Brothers & Company, Inc., in the amounts set forth in the following tabulation which also shows the income taxes withheld by the employers from such compensation: Compensation Income
Income Taxes Withheld
Luria
Luria
Summer &
Brothers &
Summer &
Brothers &
Company
Company, Inc.
Total
Company
Company, Inc.
Total
1946
$ 9,318.84
$ 9,318.84
$1,429.20
$1,429.20
1947
23,688.03
15,400.00
39,088.03
4,478.22
$2,435.60
6,913.82
1948
52,400.00
52,400.00
8,622.40
8,622.40
1949
3,828.53
44,400.00
48,228.53
192.00
6,254.40
6,446.40
1950
44,400.00
44,400.00
7,303.80
7,303.80
1951
44,400.00
44,400.00
8,395.60
8,395.60
1952
44,400.00
44,400.00
8,613.60
8,613.60
1953
44,400.00
44,400.00
8,613.60
8,613.60 The above amounts of income tax withheld for each year by each of said employers were in each case deducted and withheld from the compensation payments to petitioner during the *126 calendar year indicated and were paid over to the collector and/or district director of internal revenue for the employer's district prior to the due date of petitioners' return for said year. Petitioner was furnished with withholding statements on Form W-2 by Summer & Company with respect to compensation payments made to him by the company during the calendar years 1943, 1944, 1945, 1946, 1947, and 1949 before the respective due dates for the filing of his income tax returns on a calendar year basis for each of these years. Petitioner was furnished with withholding statements on Form W-2 by Luria Brothers & Company, Inc., with respect to compensation payments made to him by said company during the calendar years 1947 through 1953 before the respective due dates for the filing of his income tax returns on a calendar year basis for each of these years. Petitioner understood that these withholding statements were filed by the employer in each case with the Internal Revenue Service and believed that they were thus filed in Buffalo. Petitioner's gross income and deductions for the years 1943 and 1944 were as follows: 1943
1944
Gross Income: Salaries
$13,376.69
$17,940.33
Dividends
1,531.25
3,125.00
Capital gains
319.68
541.72
Interest income
12.57
22.32
Total gross income
$15,240.19
$21,629.37
Deductions: Interest
$ 322.17
$ 237.26
Taxes
678.60
816.74
Contributions
0
5.00
Total deductions
$ 1,000.77
$ 1,059.00
Net income
$14,239.42
$20,570.37
*127 The above income from salaries represented compensation income received by petitioner from Summer & Company. This company deducted and withheld income taxes from said compensation in the amount of $977.44 during the year 1943 and in the amount of $3,338.47 during the year 1944, and with respect to each of said years Summer & Company paid over the income taxes thus withheld to the collector of internal revenue for its district prior to the due date of petitioners' income tax return for said year. Gertrude had no gross income for the years 1943 through 1949. Her gross income for the years 1950 through 1953 was as follows: Capital
Gains
Short-
Long-
Divi-
Inter-
Year
term
term [1]
dends
est
1950
$2,262.83
None
$ 241.50
None
1951
None
None
792.52
None
1952
None
$411.03
1,145.00
$ 43.43
1953
None
None
730.00
219.39
Such gross income items are included in the gross income figures determined by respondent as set forth above. Petitioner, Gertrude B. Hanlon, had nothing to do with the preparation of the returns for the years 1946 through *128 1953 which were filed on May 25, 1954, and knew nothing of the details contained therein. She left such matters as income tax returns to her husband. Petitioner, Terence G. Hanlon, supplied the data with respect to Gertrude's income used in preparing said returns. The returns were made up and filed as joint returns but Gertrude did not sign them prior to filing. Petitioner, Gertrude B. Hanlon, later signed the returns at the request of the special agent of the Intelligence Division of the Internal Revenue Service who was investigating petitioner Terence G. Hanlon's income taxes for said year. At the time of such request, the special agent had already concluded to recommend imposition of fraud penalties for the years for which said returns had been filed, but he did not so inform Gertrude or tell her that by signing the returns she might be assuming liability for penalties that would be asserted against her husband. Gertrude's signature on the joint returns was not obtained by reason of any duress or improper pressure on the part of the special agent. During the years he had been employed by Summer & Company petitioner's activities consisted of the purchase and sale of scrap metal *129 and supervision of a "yard" in which scrap metal that had been purchased was processed and kept. Petitioner never kept any books of account for the office. The only records kept in the office were of incoming and outgoing shipments, and payroll. The recording of this information, which was sent to the main office of the company, was attended to by one of the office employees, and petitioner had nothing to do with that. Customers to whom sales were made were billed from the main office of the company and made payments to that office, and these matters were not handled by the Buffalo office of which petitioner was comanager. Petitioner had nothing to do with any tax matters on behalf of Summer & Company. Except for the year 1941, petitioner had never had any tax controversy with the United States Government. Petitioner paid a deficiency in income tax in 1941 in the amount of $156.76 upon the settlement of a proceeding brought in this Court. No question of fraud was involved therein. The deficiency paid was on the basis of a relatively small amount of dividend income. All income tax returns which he had filed had been filed on time and he had never asked for an extension, and, until early *130 1948, he did not know that an extension of time for filing an income tax return could be obtained. During 1946, while employed by Summer & Company, as above described, petitioner made arrangements to enter the employment of Luria Brothers & Company, Inc., commencing January 1, 1947. This company was engaged in the scrap iron and steel business on a national scale and was much bigger than Summer & Company. Petitioner was to open up a new office for Luria Brothers & Company, Inc., in Buffalo, New York, and to be the sole manager of that office. Pursuant to these arrangements petitioner submitted his resignation to Summer & Company, effective December 31, 1946, and started work for Luria Brothers & Company, Inc. Petitioner, in opening up the new office for Luria Brothers & Company, Inc., had to "start from scratch," having neither office space nor office help. He rented an office. Telephones were difficult to get, and despite great effort took 2 weeks to obtain. Office help was difficult to obtain, but petitioner succeeded in engaging two young women. During the first week he engaged one assistant, and in the second month another assistant to do buying and selling of scrap metal. *131 These assistants were without adequate experience and petitioner had to train them. To obtain customers in the Buffalo-Rochester-Syracuse area petitioner had to take customers away from Summer & Company. For this purpose petitioner had to visit these customers repeatedly in Buffalo, Syracuse, Rochester, Albany, and Elmira. In addition to visiting customers, petitioner had to visit other offices of Luria Brothers & Company, Inc., including Pittsburgh, Detroit, and New York. He always went to Detroit in the last week of the month to bid on lists of automobiles sold by the automobile companies. Such visits to other offices during the first 3 months of 1947 would average more than 7 days a month. During the first 3 months of 1947 petitioner worked 14 to 16 hours a day. He worked on weekends, Saturday afternoons and Sundays, and on 4 or 5 nights during the week. He also kept up some social contacts during the taxable years through his membership in several social clubs. At one of them, the Buffalo Athletic Club, he regularly bowled on Friday nights when he was in town during the years 1944 through 1948. He was home on the average of one night a week during the week, apart from the weekends. *132 He worked harder than he did when employed by Summer & Company. Starting from "scratch," the business of the Buffalo office managed by petitioner amounted to $1,000,000 in the first year and over a period of 8 to 10 years was built up to $26,000,000 per year. This kept petitioner very busy even after 1947, the first 5 or 6 years being the most difficult, but the first 6 months of 1947 were the hardest of all. Petitioner knew he was required to file an income tax return for 1946, but, because of the fact that he was so busy during the first few months of 1947 and because of all the time he was spending in getting the new office under way, he forgot about it until after March 15, 1947. When he realized, after March 15, 1947, that he had failed to file his return, he was concerned but did not know what to do about it. During the entire year 1947 he was very busy and traveled a great deal. At a meeting of the Iron and Steel Institute in January 1948 petitioner learned of an impending sale of artillery shells in the Philippines by the United States and Philippine governments. He became interested and interested his employer company in this sale. It was decided to make a bid and petitioner *133 volunteered to go to the Philippines for that purpose. Petitioner obtained a passport on February 9, 1948, and left Buffalo prior to February 12, on which date he obtained a Philippine visa in San Francisco. Prior to leaving Buffalo he spoke to an acquaintance, William Kraetz, who petitioner had recently learned was employed in the Internal Revenue Service. Kraetz was in fact assistant chief field deputy in the office of the collector of internal revenue in Buffalo. Petitioner told Kraetz he was going to the Philippines and might not get back by March 15 and asked him what he should do about his income tax return in time to prepare and file it by that date. Kraetz told him to wire him and that he would secure an extension for petitioner. Kraetz had no authority himself to grant such an extension. Petitioner arrived in the Philippines on February 20, 1948, and reentered the United States at Honolulu on March 11, 1948. He arrived in Los Angeles about March 14, 1948, and sent a telegram from there to Kraetz asking for an extension. Kraetz referred the telegram to the assistant to the collector. Petitioner received an extension of 30 days to file his 1947 return. Petitioner returned *134 to Buffalo from Los Angeles in the early part of April 1948. Petitioner immediately had to spend a great deal of time in New York to organize the work in connection with the successful bid he had made in the Philippines. He spent a week in New York, returned to Buffalo for a day, returned to New York for several days, back to Buffalo for a day, and then back to New York. As a result he did not file his 1947 income tax return by April 15, 1948, the extended due date. Petitioner became greatly worried about his failure to file 2 years' income tax returns. In October or November of 1948 he consulted the attorney, Emery S. Tucker, who had handled the 1941 Tax Court proceeding for him, and in whom petitioner at that time had absolute confidence, having known him for many years. Tucker advised petitioner that he would take care of the matter. In December 1948 petitioner spoke to Tucker again saying he would like to have the matter attended to. Tucker told him there was "a time and place for everything" and to wait and he would take care of the matter. Petitioner understood from this that he was to wait and not do anything until Tucker told him what to do. Between December 1948 and March 15, 1949, he *135 spoke to Tucker again and was given the same advice - to wait. Petitioner did not file his 1948 income tax return, due March 15, 1949, because he was waiting for Tucker to tell him what to do. From October 1949 to early March 1950 petitioner's wife Gertrude was in the hospital and in danger of dying until about 2 weeks before her release. During this period petitioner spent 7 or 8 hours every day in the hospital in the afternoon and in the evening. He had great difficulty in carrying on his business. During approximately the same period Tucker was sick also and it looked as if he might die. While Gertrude was in the hospital petitioner took care of the sale of their house at 88 Lancaster Avenue and the moving of their residence from 88 Lancaster Avenue to the apartment at 800 West Ferry Street in December 1949. Under all these circumstances and because of the advice to wait which he had received from Tucker before the latter became sick, petitioner failed to file his income tax return for 1949. By this time petitioner was "scared to death" by the accumulation of unfiled returns. He spoke several times to Tucker in 1949 and 1950 and put pressure on him to do something about the *136 matter, but Tuker continued to tell him to wait. In the latter part of 1952 Tucker asked him to assemble material for the purpose of preparing the returns and petitioner had it all assembled. In February 1953 just before petitioner left for Montreal on a business trip Tuker advised him that immediately on petitioner's return the matter would be attended to. While petitioner was in Canada on this trip Tucker died. Because of fear and shame petitioner did not consult another lawyer and continued to do nothing about his income tax returns. Petitioner was aware at all times that he owed taxes to the United States and that the amount was pilling up. Petitioner did not invest the unpaid taxes in any business, enterprise, speculation, or real estate, or use it to pay any personal debts. Over and above the amounts required for taxes he invested $20,000 in some buses. Aside from this investment he kept his funds in the bank and in easily convertible securities, and at all times had enough funds on hand in this form to pay the taxes he owed. He expected to pay his taxes eventually and expected that returns would be prepared by Tucker at some appropriate time in some appropriate manner. He *137 intended to file these when prepared and to pay the taxes with interest. He had at all times enough liquid assets to enable him to make such payments. With respect to his gains on sales of securities petitioner preserved his brokers' statements and advices and this represented his record of securities sales and purchases. The interest income, with the exception of one small item received from a stockbroker and with the exception of interest received from Joseph Amigone, consisted of interest on savings accounts. The savings account passbooks constituted petitioner's record of the interest received on such accounts and were used by him as the basis of reporting such interest in the case of the returns which he filed on time. Petitioner kept a detailed record of his dividend income for the years 1944 through 1953. Such record was prepared currently at the time he deposited the dividend checks. This record included only petitioner's dividend income and did not include the dividend income which Gertrude started receiving in 1950. This record was substantially accurate except for the omission of Gertrude's dividend income. This record also contained a listing of payments of interest, *138 taxes, and contributions, and of income taxes withheld. Petitioner kept this record for the purpose, inter alia, of eventually making out his income tax returns for the years 1946 through 1953. In the spring of 1954 an internal revenue agent was examining the 1952 income tax return of Joseph Amigone who claimed therein a deduction on account of interest paid to the petitioner. Thinking that the amount claimed might be excessive or inclusive of repayments on principal, the agent decided to look at petitioner's return for that year to see how petitioner had treated this payment. When he consulted the card index file in the collector's office at Buffalo he could find no card showing that petitioner had filed a return for 1952 or for any other year back as far as 1948. At sometime toward the end of April 1954 the agent called on petitioner at his office and asked him whether the payment of Amigone was interest. Petitioner said that it was. The agent then explained that he would not have bothered petitioner with the inquiry if he had been able to find petitioner's return for 1952 in the file of his office, and asked petitioner whether he had filed his return for that year in the Buffalo *139 collector's office. Petitioner answered to the effect that he had and that he always filed his returns with that office. The agent then asked for the correct spelling of petitioner's name and address and that of petitioner's wife, and thereupon terminated the interview. Petitioner instructed Joseph McAvoy, an accountant and formerly an employee of the Internal Revenue Service, to prepare and file income tax returns for the years 1946 through 1953. For this purpose petitioner gave McAvoy all the information he had that in his opinion bore upon the income tax returns for these years. He gave him his record of dividend income and interest, taxes, and contribution deductions, and income taxes withheld, all of his bank statements and cancelled checks, his brokerage statements, his and his wife's savings bankbooks, and his wife's brokerage statements. McAvoy was retained by petitioner on May 4, 1954, and hurriedly completed the returns in time for filing on May 25, 1954. Petitioner was not familiar with the details contained in these returns and saw them only for the minute that he signed them. In the meantime and immediately after his first interview with petitioner the revenue agent *140 again checked his office card index files and found nothing indicating that petitioner had filed returns for the years 1948 through 1953. He thereupon tried to get in touch with petitioner by telephone in order to ask for the duplicate copies of the returns for those years which petitioner had indicated to him that he had. After about a week the agent succeeded in talking with petitioner on the telephone and petitioner told him to see his accountant McAvoy. After some difficulty the agent finally got in touch with McAvoy by telephone on May 18, 1954, and McAvoy informed him that petitioner had not filed any income tax returns for the years 1946 through 1953. The following day a special agent was assigned to the investigation of the case. The returns filed by petitioner in May 1954 for the years 1946 through 1953 were examined by a special agent from the Intelligence Division and by the internal revenue agent. The examination took about a week. In connection with this examination McAvoy made available to the examining agents petitioner's record of dividend income, deductions, and taxes withheld, the securities buy and sell orders, brokerage statements, canceled checks for the years *141 1951 through 1953, bank deposit slips, bank statements, savings bankbooks, and Forms W-2 as to petitioner's compensation income and income taxes withheld therefrom. McAvoy made available to the examining agents all the records he had, and furnished to them such additional information as they requested concerning petitioners' income and deductions. Prior to this examination the special agent and the agent had made independent surveys and inquiries relating to petitioner's income for the years in question. All of the bank and brokerage accounts belonging to petitioners were in their names. They had no fictitious accounts. They had no concealed income, no income received in cash or that was not deposited either in a brokerage account or in a bank account. They had no double or false or fictitious sets of books. They had no illegal sources of income. Respondent's determination of petitioners' net income was not made by the so-called "net worth method." Respondent did not determine that petitioner had income in the form of unexplained deposits. Respondent determined petitioners' income from the Forms W-2 and by letters from the employers as to compensation income, and by examination of *142 petitioners' bank and brokerage accounts, petitioner's record of dividends and Forms 1099, and standard security services. Petitioner was indicted and on October 11, 1955, pleaded guilty and was convicted, under section 145(a) of the Internal Revenue Code of 1939, of wilfully failing to file Federal income tax returns for the years 1951, 1952, and 1953. Petitioner was fined a total of $9,000 and a 6 months' prison sentence was suspended. Opinion KERN, Judge: This case presents at the outset two troublesome questions of fact: First, whether petitioner filed income tax returns for the years 1943 and 1944, and, second, whether petitioner's failure to file returns for those years, if they were not filed, and his failure to file timely returns for the years 1946 through 1953 was part of a fraudulent scheme which would justify a conclusion that any part of the deficiencies for those years was due to fraud with intent to evade tax. We have carefully gone through the rather astonishing record in this case and have studied it repeatedly in the light of the excellent briefs filed herein. In spite of this consideration and study, we continue to have grave doubts as to both questions and *143 have felt it necessary to decide them in a negative way in reliance on the rule as to the burden of proof. On the first question the burden of proof is on the petitioner. The evidence adduced with regard to it may be summarized as follows: In 1954 agents of respondent searched the appropriate records for 1943 and 1944 which remained available and found no record indicating that petitioner had filed returns for those years. On cross-examination of one witness and by direct testimony of another witness it was brought out that there was a possibility, as a result of human errors on the part of clerical employees, that the records available in 1954 might not have covered the filing of these returns even if they had been filed, although this was rather a remote possibility. On June 16, 1954, petitioner refused to answer a question propounded to him by respondent's agents as to whether he had any recollection of filing income tax returns for the years 1943 and 1944, but on July 8, 1954, he submitted an affidavit to the agents stating that: "It is my best present recollection that I did file income tax returns for the years 1943 and 1944 but I must frankly state that the recollection is *144 not definite and not certain." Later petitioner insisted to one of the respondent's agents that he had filed them. At the trial petitioner testified that to the best of his "recollection or knowledge and belief" he filed the returns, that he was absolutely sure that he had filed them, and that he was 99 per cent certain that he had filed them. The only substantiation of petitioner's self-serving testimony consists of some scraps of loose papers containing figures, some of which had to do with certain phases of petitioner's income for 1943. While petitioner had not failed to file returns for years prior to 1943, he concedes that he neglected to file returns for the years 1946 and 1947 and failed to file returns for the years 1948 through 1953. This resume of the evidence will indicate the nature of the arguments on this issue which have been made by counsel. While petitioner has been able to persuade himself to change from a position of doubt on this issue to one of 99 per cent certainty, he has not been able to persuade us to conclude that respondent erred in his determination that no returns for the 2 earlier years were filed by petitioner, and we are unable on the record before *145 us to make a finding to that effect. On the issue of fraud the burden of proof is on respondent and this burden is to adduce proof which is "clear and convincing." The evidence on this issue has been set forth in extenso in our findings. The respondent in his argument points out the failure of petitioner to file returns for the years 1946 through 1953 and also contends that petitioner's books and records were inadequate and that petitioner made equivocal statements to respondent's agent when inquiry was made as to the filing of returns. He would have us conclude that petitioner's failure to file those returns was the result of fraudulent intent. Obviously petitioner wilfully failed to file returns for the years 1946 through 1953. For this offense he has already been punished and, in addition to a substantial fine, he concedes that he is liable for the payment of additional taxes on account thereof. It is equally obvious that the continued failure of petitioner to file returns constituted a course of conduct vigorously to be condemned. However, we are not convinced from the peculiar facts here present and a study of petitioner himself on the witness stand that this failure was *146 due to fraudulent intent. The failure to file returns does not necessarily in and of itself constitute fraud. It is a fact, entitled to great weight, to be considered along with other facts in the case. The other facts stressed by respondent in his argument that the petitioner was guilty of fraud were the alleged inadequacy of petitioner's books and records and his alleged equivocal statement when first questioned by respondent's agent. We are not impressed by either of these facts. The financial records in the possession of petitioner, though not in a desirable form and though not in some respects complete, were not the kind of records normally associated with fraud. While they might possibly justify a charge of gross negligence, there is nothing about them, in our opinion, to indicate a fraudulent intent. As to the alleged equivocal statement by petitioner as to his filing returns (with regard to which there is conflicting testimony), we think that this must be considered in the light of petitioner's immediate reference of the whole matter to a qualified accountant with instructions to make an immediate and complete disclosure (a step which petitioner, of course, should have taken *147 many years before). The facts stressed by petitioner are set out in detail in our findings. Upon the record before us and our appraisal of petitioner while on the witness stand, our opinion on this issue is as follows: It is entirely possible that petitioner was guilty of fraud, but we are not convinced that he was. Accordingly, we conclude that the respondent has failed to prove fraud by clear and convincing evidence. The additions to tax under section 291(a), Internal Revenue Code of 1939, are approved for all years as determined by respondent and modified by his concession that there is no liability for such taxes on the part of petitioner Gertrude for the years 1943 and 1944. Petitioners concede the correctness of respondent's determination of additions to tax under section 294(d), Internal Revenue Code of 1939, except as to petitioner Gertrude for the years 1946 through 1949 during which Gertrude had no gross income. The contention on this point was made for the first time on brief and no authority is cited therefor. In our opinion the contention is without merit. Decision will be entered under Rule 50. Footnotes
1. The petitioner paid half of this amount; the other half was canceled on the collector's books by reason of the forgiveness provisions of the Current Tax Payment Act of 1943, section 6(a).↩
1. The return shows $19,354.44, but subtraction of the tax withheld shows that the net tax liability was determined as if this figure were $19,454.44. Note also that the notice of deficiency, page 14, treats this item as $19,454.44.↩
2. See footnote No. 1.↩
1. After giving effect to 50 per cent reduction applicable to long-term capital gains.↩